**F I L E D**

PUBLISH

**July 25, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LONNIE WRIGHT RICHIE,

> Petitioner - Appellee,

v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

> Respondent - Appellant.

No. 04-5072

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. CV-98-482-K (J))**

Randy Bauman and Scott W. Braden, Assistant Federal Public Defenders,  Death
Penalty Federal Habeas Corpus Division, Oklahoma City, Oklahoma, for
Petitioner - Appellee.

Preston Saul Draper, Assistant Attorney General (and W.A. Drew Edmondson,
Attorney General of Oklahoma, on the briefs), Oklahoma City, Oklahoma, for
Respondent - Appellant.

Before **KELLY**, **HARTZ**, and **McCONNELL**, Circuit Judges.

**KELLY**, Circuit Judge.

Respondent Mike Mullin, Warden of the Oklahoma State Penitentiary, appeals the district court's order granting conditional habeas corpus relief in the form of a new trial to Petitioner Lonnie Richie, an Oklahoma state prisoner convicted of first degree murder and sentenced to death. The sole issue on appeal is whether defense counsel rendered ineffective assistance of counsel in cross-examining Dr. Robert Hemphill, a medical examiner employed by the State of Oklahoma. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.

**Background**

On August 28, 1991, Mrs. Laura Launhardt was kidnaped from a K-Mart parking lot in Tulsa, Oklahoma. She was then taken to an abandoned, storm-damaged home in a rural area. There her kidnappers bound Mrs. Launhardt's hands and feet, tied a strap around her neck, and secured the strap to a clothes rod in a closet. On September 1, 1991, Mrs. Launhardt's decomposing body was discovered by police investigators.

At trial, the state introduced testimony affirmatively linking Mr. Richie and an accomplice to the scene of the abduction and the subsequent sighting of Mrs. Launhardt at a location not far removed from the home where her body was eventually found. The state also introduced evidence implicating Mr. Richie in the use of the victim's bank and credit cards in the days following her abduction

- 2 -

to secure a hotel room for himself and his accomplice, finance a shopping spree, and pay for a trip to New Orleans with his former girlfriend.

In its efforts to obtain a first degree murder conviction, the state advanced the theory that Mr. Richie seized and lifted his victim's ankles while she was bound and secured to the clothes rod, causing death by strangulation. The state presented evidence through Officer Roy Heim establishing that Mrs. Launhardt's body was found with her hands bound behind her back and her dress pulled above her hands. The state argued repeatedly during its closing that the position of the body supported its theory of death. The state also solicited testimony from Dr. Hemphill establishing that the medical evidence was consistent with the state's theory. We discuss Dr. Hemphill's testimony extensively below.

Attempting to avoid a conviction predicated on malice aforethought, and therefore death penalty eligible, Mr. Richie's defense largely rested on the contention that his victim was left alive, though restrained, by her kidnappers. In support, Mr. Richie offered expert testimony by Dr. Bernard Greenburg, a noted expert in forensic entomology, establishing Mrs. Launhardt's time of death at 7:00 p.m. on August 30. Dr. Greenburg based his conclusion on the size of the maggots found on Mrs. Launhardt's body and recorded during Dr. Hemphill's medical examination. In addition, the defense solicited testimony on cross-examination from two police officers, Corporal Gary Meek and Officer Roy

Heim, tending to support the "left-alive" theory.

Mr. Richie was subsequently convicted in the District Court of Tulsa County, Oklahoma, of first degree murder with malice aforethought, and alternatively felony murder, and other lesser offenses. He was sentenced to death. On direct appeal, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed his conviction and sentence for malice aforethought murder, but reversed the conviction for felony murder on the grounds that the judge had failed to properly instruct the jury. Richie v. State, 908 P.2d 268, 275, 280 (Okla. Crim. App. 1996). Mr. Richie raised, inter alia, the issue of ineffective assistance of counsel for the first time in an application for post conviction relief. Mr. Richie's application was denied.[1] Richie v. State, 957 P.2d 1192 (Okla. Crim. App. 1998).

Thereafter, Mr. Richie sought habeas relief before the district court pursuant to 28 U.S.C. § 2254. Mr. Richie raised twenty-one grounds for relief in his petition. The district court granted Mr. Richie an evidentiary hearing as to four grounds relating to assertions of ineffective assistance. Following the

---

[1]This case does not implicate deference concerns under the Antiterrorism and Effective Death Penalty Act because the issue is res nova. See 28 U.S.C. § 2254(d). The OCCA found that Mr. Richie's ineffective assistance claim was procedurally barred. Richie, 957 P.2d at 1196. Relying in part on our decision in Cargle v. Mullin, 317 F.3d 1196, 1212 (10th Cir. 2003) (holding that Oklahoma's procedural bar rule does not preclude consideration of matters outside the trial court record during federal habeas review), the district court properly determined that the OCCA's decision did not bar review of Mr. Richie's claim. II Aplt. App. at 573.

hearing, the magistrate judge filed a report and recommendation concluding that Mr. Richie was denied effective assistance of counsel at trial and recommending that the district court grant the petition for a conditional writ of habeas corpus. Over the objections of the state, the district court adopted the report and recommendation, entering an order conditionally granting habeas relief. This appeal followed.

**Discussion**

On appeal from the grant of habeas relief, we review the district court's factual findings for clear error and its legal conclusions de novo. Sallahdin v. Mullin, 380 F.3d 1242, 1247 (10th Cir. 2004). The district court concluded in this case that Mr. Richie's counsel was constitutionally deficient in cross-examining the medical examiner, Dr. Hemphill, and that this deficiency so prejudiced the defendant as to necessitate a new trial.

The Supreme Court enunciated the now familiar test for ineffective assistance of counsel claims in Strickland v. Washington, 466 U.S. 668, 687 (1984). To succeed on such a claim, the convicted defendant first has the burden to demonstrate that his counsel's performance was "deficient," i.e., that the "representation fell below an objective standard of reasonableness." Id. at 688. Next, the defendant must show that his "counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

A reviewing court need not address the Strickland prongs sequentially. Bryan v.

Mullin, 335 F.3d 1207, 1216 (10th Cir. 2003). Moreover, a determination that the

defendant fails to satisfy one prong precludes further analysis. Id.

With respect to the first prong of the Strickland test, the Court emphasized

that "[j]udicial scrutiny of counsel's performance must be highly deferential." Id.

at 689. "The proper measure of attorney performance remains simply

reasonableness under prevailing professional norms." Id. at 688. The inquiry

must embrace all relevant circumstances of the case, and there is a strong

presumption that counsel has rendered effective assistance and made decisions in

the exercise of reasonable judgment. Id. at 690. Finally, those decisions alleged

to be deficient must not be viewed in a vacuum; the court must assess such

actions from the vantage point of counsel at the time of their making and with all

relevant facts in mind. Id.

Having carefully reviewed the record, we hold that the district court erred

in concluding that defense counsel's cross-examination of Dr. Hemphill was

constitutionally deficient. The district court failed to accord sufficient deference

to counsel's performance and appropriately consider all relevant circumstances

attending Mr. Richie's trial. Based on the evidence presented at trial and all

relevant circumstances attending thereto, defense counsel's cross-examination of

Dr. Hemphill was reasonable and entitled to deference.

I.       Defense Counsel's Communications with Dr. Hemphill

Mr. Richie's claims center almost exclusively on Dr. Hemphill's testimony. According to the testimony of defense counsel and the deposition of Dr. Hemphill received at the evidentiary hearing, the two met prior to trial to discuss Mr. Richie's case. III Aplt. App. at 610, 882. While counsel's and Dr. Hemphill's accounts of the meeting differ, counsel evidently left the meeting under the impression that the medical examiner viewed the state's theory of death as improbable, while viewing the defense's theory as plausible. Id. at 610; but see id. at 886-88 (providing Dr. Hemphill's recollection). Proceeding on the assumption that Dr. Hemphill was a "defense witness," Mr. Richie's counsel chose not to prepare another expert witness for trial. Id. at 612. In recalling this decision, defense counsel noted that the alternate witness was in basic agreement with Dr. Hemphill's conclusions. Id.

During trial, but prior to testifying, Dr. Hemphill pulled defense counsel aside and informed her that, after considering a statement made by Mr. Richie's co-defendant, Danny Waller, he did not want "to blind-side her, so-to-speak" and intended to testify that the state's theory of the manner of death was consistent

with the evidence.[2]  Id. at 613, 890-93.  Again, accounts of the conversation differ.  While Dr. Hemphill minimized the significance of the conversation by explaining that this testimony would be responsive to those questions posed by the state, whatever they might be, id. at 891-95, defense counsel testified at the evidentiary hearing that the conversation left her "devastated."[3]  Id. at 614.

## II.  Dr. Hemphill's Trial Testimony

Dr. Hemphill testimony at trial was somewhat limited.  On direct examination, he testified that the cause of death was "asphyxiation by ligature."  VII Aplt. App. at 2078.  Elaborating, Dr. Hemphill noted:

> Based on the circumstances under which the body was found, that is that it was partially suspended by this ligature being tied to a clothes bar or something like that in a closet, that she was lying face down with her face slightly off the floor, partially suspended in that sense, it's my opinion that suspension or partial suspension as in hanging probably played a major part in the mechanism, that is in putting enough pressure from this ligature on the blood vessels of the neck to cause asphyxiation.

---

[2]In one of several contradictory statements, Danny Waller informed the police that Mr. Richie had held Mrs. Launhardt by her ankles while she was suspended by the strap, causing her death by strangulation.  Waller has since recanted this statement in testimony that was not without further contradiction.  III Aplt. App. at 705.  At trial, Mr. Richie asserted that it was improper for the medical examiner to rely on inadmissible hearsay in making determinations as to cause and manner of death.  This precise issue is not before us.

[3]The dissent emphasizes the consistency of defense counsel's testimony at the evidentiary hearing with Dr. Hemphill's testimony and her purported reaction to the conversation during trial.  We note, however, that the state telegraphed Dr. Hemphill's testimony during its opening statement, calling into question defense counsel's recollected feelings of surprise.

Id. at 2079. Dr. Hemphill further testified to his opinion that "overwhelming evidence" indicated that Mrs. Launhardt's death was a homicide. Id. at 2083. In other words, "somebody else did this to her, she didn't do it to herself." Id. However, the doctor continued:

> Beyond that there's not a whole lot more that I can say. I don't know how many people were involved. I don't have any evidence to indicate that. I don't know exactly what the person did. In what sequence and what he might have said or anything else.
> All I can say is that this evidence indicates that someone killed this person by partially suspending her by the neck while she was bound and face down in the position which she was found.

Id. at 2084. Dr. Hemphill's sole testimony relating to the manner of death occurred in the following exchange.

> Q: (By Mr. Gillert [the prosecutor]) Let me ask you this hypothetical: If someone were to bind her hands behind her and bind her feet as she was found, tie the ligature around her neck and tie it to the pole with the length of the rope, would it be consistent with your findings that they suspended the person by some lower extremity while they hung to affect the death in the manner in which you found, is that consistent?
> A: Yes. As far as I can see, it would be consistent.

Id. at 2084-85.

Finally, Dr. Hemphill testified to the time of death based on the condition of the body, placing the victim's death at approximately 72 hours prior to discovery of her body. Id. at 2102. However, Dr. Hemphill qualified his testimony by stating:

So understanding that other evidence might–other evidence of a definitive nature might turn out–turn up somewhere, I don't know of any, but it might turn up indicating that this is not correct. My best estimate would be that probably somewhere between the time shortly after the time of disappearance and about 72 hours prior to her being found is when death occurred.

Id.

The record discloses that throughout Dr. Hemphill's testimony, defense counsel vigorously objected on numerous grounds. See, e.g., id. at 2079-84 (objecting as to Dr. Hemphill's opinion of "most likely" explanation of death and the doctor's reliance on Waller's statement), at 2085 (moving for mistrial after Dr. Hemphill obliquely referred to statement by Waller), at 2090 (same). In so doing, defense counsel was successful in limiting Dr. Hemphill's testimony as to simply whether the prosecution's theory was consistent with the evidence, id. at 2082, and in obtaining a court admonishment that the jury should disregard the doctor's reference to Waller's statement. Id. at 2085.

Defense counsel's cross-examination of Dr. Hemphill was indeed brief, as she repeatedly iterated it would be. Id. at 2103. Given its importance to our analysis, we reproduce it in its entirety.

> Q      First of all, Doctor, you have no medical evidence to show that the death occurred anywhere but Pawnee County; is that correct?
> A      That's correct.
> Q      Secondly, the larvae or maggots that you've testified about from your report, they vary in length from 2 millimeters to 1 centimeter?
> A      Let me just double check my notes. Yes, that is correct.

Q    And you did not collect any of these; is that right?  Preserve any of them?
A    That's correct.
Q    And finally, Doctor, you have no medical evidence that is inconsistent with Ms. Launhardt being tied, restrained in that closet in a sitting or standing position, correct?
A    That's correct.

Id. at 2103-04.  There was no redirect.

III.    The District Court's Conclusions

Having reviewed the trial and evidentiary hearing records, the district court found that Mr. Richie had been denied effective assistance of counsel.  Its reasoning is set forth in the magistrate's Report and Recommendation and the district court's own Order.  The district court concluded that Dr. Hemphill provided the only evidence supporting the state's theory and that defense counsel allowed the state's presentation of its theory through the doctor to go unchallenged.  II Aplt. App. at 575-76.  Noting that Dr. Hemphill was willing to testify that the defense's theory was consistent with the evidence, the district court found that the "inadequacy of the cross-examination" was evident on the face of the trial record and that defense counsel inexcusably lost the opportunity to present its theory through Dr. Hemphill's testimony.  Id. at 576.

The magistrate judge concluded that following the conversation with Dr. Hemphill, defense counsel could have taken any number of actions which might have affected the outcome of the case.  Id. at 524.  Defense counsel could have

asked for a continuance or short break in the proceedings.  Id.  Moreover, defense counsel could have sought additional expert testimony, though the benefit of such testimony is not entirely clear.  Id.

Having found defense counsel's performance constitutionally deficient, the district court then concluded that Strickland's prejudice prong was likewise satisfied.  The court posited that defense counsel had failed in general to advance Mr. Richie's theory of the case and had failed to require the state to meet its burden.

IV.  The District Court Erred in Determining that Defense Counsel Rendered Ineffective Assistance

The deferential standard established in Strickland stems from the inherent disadvantage of our perspective.  We are left with a cold record, augmented by testimony produced in evidentiary hearings that benefits in its acuity from the passage of time.  In fact, all too frequently we are confronted with trial counsel denigrating their own performance.  We do not question counsel's motives or sincerity.  However, avoiding the pitfalls of hindsight, our present duty is to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed *as of the time* of counsel's conduct."  Strickland, 466 U.S. at 690 (emphasis added).

What then were the circumstances confronting defense counsel at the time

of Dr. Hemphill's cross-examination? We note at the outset that the district court clearly erred in finding that Dr. Hemphill provided the only evidence supporting the state's theory. We agree with the state that testimony by Officer Heim establishing the position of the victim's dress at the time her body was discovered, coupled with photographs of the crime scene, also provided evidence supporting the state's theory.[4]

Turning to the additional circumstances present in the case, consistent with the findings of the magistrate judge adopted by the district court we assume that defense counsel was indeed surprised by the conversation she had with Dr. Hemphill prior to his taking the witness stand. However, by the time defense counsel rose to cross-examine Dr. Hemphill, the parameters of the case were clear. The prosecution had presented no direct evidence establishing the manner of the victim's death. As demonstrated in the portions of his direct testimony quoted above, Dr. Hemphill's witness-stand assertions were hardly absolute, leaving both sides room to maneuver. Furthermore, defense counsel had successfully precluded the medical examiner from testifying as to the manner of

---

[4]The dissent argues erroneously that "[i]n the pictures discussed by the witnesses, Mrs. Launhardt's skirt had been moved to display the ligatures on the victim's wrists." Dissent at 9. However, the testimony of Officer Heim makes clear that State's Exhibit 23 depicted the victim in the position in which she was found. Collectively, the photographs provided strong evidence supporting the prosecution's theory.

- 13 -

death he thought most likely. By the close of direct examination, the state had only established that its theory would be "consistent" with the medical evidence.

At the same time, defense counsel was aware that she had solicited testimony from Corporal Meek supporting the theory that the defendant had been left alive. VII Aplt. App. at 2032. She had also solicited testimony from Officer Heim establishing that until the moment of the discovery of the body, having been led to the scene of the crime by Mr. Richie's accomplice, the police had treated the case as one involving a missing person, as opposed to a homicide. Id. at 2054. Furthermore, defense counsel could anticipate testimony from Dr. Greenburg establishing the victim's death at a time when Mr. Richie was traveling in a stolen van to New Orleans. Finally, defense counsel was aware that the other pathologist she had consulted was in basic agreement with Dr. Hemphill's original opinions. It is under all these circumstances that we must review defense counsel's cross-examination and handling of the case.

We have previously noted that counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy. See Pickens v. Gibson, 206 F.3d 988, 1001-02 (10th Cir. 2000); Boyd v. Ward, 179 F.3d 904, 915 (10th Cir. 1999). Nothing in the record would lead us to a contrary conclusion here. Although defense counsel understandably may have felt "devastated" by her conversation with Dr. Hemphill, her conduct during his

- 14 -

testimony was aggressive and successful. It is counsel's objective performance that must guide our inquiry. With this in mind, the line of questioning pursued during cross-examination objectively represents a responsive, tactical choice. We disagree with the district court's conclusion that counsel's cross-examination was deficient on the face of the record.[5] Experience teaches that rarely can performance be measured by the length of cross-examination alone. In this case, counsel engaged in a succinct line of questioning going to the heart of her case. Questions were posited regarding the size of the maggots on Mrs. Launhardt's body to support the anticipated testimony of Dr. Greenburg. Moreover, defense counsel established through the testimony of Dr. Hemphill that the victim could have been tied or restrained in a sitting or standing position.[6] While it is true that

---

[5]The dissent asserts that we owe deference to the magistrate judge's credibility determinations respecting defense counsel's assertion at the evidentiary hearing that her conversation with Dr. Hemphill prior to his testimony left her devastated. The dissent notes that "[a]n appellate court's suspicion that a witness had an incentive to shade her testimony regarding her past thoughts and emotions is insufficient to justify overruling a lower court's credibility determination." Dissent at 15. Contrary to this assertion, we have not disturbed any determination touching on the credibility of the witnesses in the evidentiary hearing. The district court did not rely on the magistrate judge's credibility determination in finding that counsel's performance was deficient; the district court did so on the face of the trial record. Our conclusion in this case flows from the de novo review of that determination. The dissent's apparent deference to the credibility determination of the magistrate judge in this context is both immaterial and misplaced.

[6]The dissent contends that defense counsel's question whether Mrs. Launhardt might have been tied or restrained in a sitting or standing position "could have served as the opening salvo in an effective line of questioning, but

- 15 -

defense counsel did not explicitly ask whether the evidence was consistent with the victim being left alive, we cannot say that this single omission, if it was that, under all the circumstances present renders counsel's performance constitutionally deficient.[7]  Finally, given the measured and qualified nature of Dr. Hemphill's testimony, we will not find fault in counsel's decision to eschew further expert testimony, that based on counsel's own statements, may indeed have proved duplicative.  Moreover, a longer cross-examination of Dr. Hemphill may have resulted in more resolute testimony, and a redirect examination reinforcing the state's theory of the case.

---

without more, it must have seemed to the jury more a confirmation of guilt than a step in a line of defense." Dissent at 19.  The dissent's contention is steeped in gross speculation and underscores the dangers inherent when an appellate court seeks to animate a cold record, substituting well-intentioned assumptions drawn at some remove for equally plausible explanations supported by the actual trial record.  Far from serving as a "confirmation of guilt," the logical inference to be drawn from defense counsel's question, that Mrs. Launhardt was left alive in such a position, stood in direct contradiction to the state's theory.  Indeed, it was just this inference that defense counsel emphasized in closing argument.

[7]Defense counsel emphasized the inconclusiveness of Dr. Hemphill's direct testimony and made the following statement during closing arguments: "But [Dr. Hemphill] also says on the same hand, same balance, that the medical evidence is consistent with [the victim] being restrained, but alive.  That she was left there restrained, but alive and he said there's nothing inconsistent with that."  VIII Aplt. App. at 2228-29.  No objection was noted, and the context of the statement might well reflect an argument from inference.  While the magistrate judge was arguably correct in noting that this statement was not consistent with Dr. Hemphill's actual testimony, we believe counsel's argument further underscores the danger inherent in second-guessing reasoned decisions during the course of cross-examination.

Having reached the conclusion that the district court erred in finding Mr. Richie's counsel constitutionally ineffective in cross-examining Dr. Hemphill, our inquiry ceases. We need not address arguments relating to <u>Strickland</u>'s prejudice prong. <u>Bryan</u>, 335 F.3d at 1216. Accordingly, we REVERSE the conditional grant of a writ of habeas corpus. In that the district court has not addressed many of Mr. Richie's remaining arguments in his petition, we REMAND for further proceedings not inconsistent with this opinion.

04-5072 - *Richie v. Mullin*

**HARTZ**, Circuit Judge, concurring:

Mr. Richie's § 2254 application raises a number of challenges to his conviction and sentence. One or more may ultimately prove meritorious. At this stage, however, I must concur in reversal of the district court's judgment, which addressed only one of the challenges. I agree with the essence of Judge Kelly's analysis, but I write separately to explain further why I believe the present record does not justify the district court's determination that the conduct of Mr. Richie's defense counsel was objectively unreasonable.

Once Dr. Hemphill told defense counsel that he was relying on the statement of codefendant Waller to conclude that the state's theory of the cause of death was correct, defense counsel had little room to maneuver. The best course of action would be to challenge the propriety of Dr. Hemphill's reliance on an inadmissible confession by a codefendant. Indeed, defense counsel did just that, vigorously and repeatedly objecting that such use of hearsay was improper. The trial judge, however, overruled the objections.[1]

---

[1]The first exchange regarding Dr. Hemphill's reliance on Waller's statement was as follows (my interstitial comments appear in brackets in bold type).

> [PROSECUTOR]: . . . Can you explain to the jury then how—what you believe to be the most likely explanation about how she hung?

[DEFENSE COUNSEL]:  Objection, Your Honor, as to most likely.  Ask to approach the bench.

THE COURT: Well - -

[DEFENSE COUNSEL]: Objection, most likely.

THE COURT: I'll overrule that, give you an exception.

[DEFENSE COUNSEL]: May we approach the bench?

THE COURT: All right.

(The following ensued out of the hearing of the jury.)

[DEFENSE COUNSEL]: Your Honor, I have no objection to him testifying about whether the medical evidence is consistent or inconsistent with some hypothetical situation.  I do object to him testifying as to his opinion about what's likely or unlikely for this manner of death to have occurred and one basis besides just whether he's qualified to testify about what's likely.

Beyond that, Your Honor, he bases his opinion upon evidence which is not admissible in this court. **[Defense Counsel is now switching gears and raising a new objection to the proposed testimony.]** Namely, there's a statement from taken [sic] Waller that she was held up and suspended as the prosecutor demonstrated in opening argument.  Danny Waller's statement is not admissible here against us and yet, he bases his opinion upon their inadmissible evidence.

I think, and I don't know, I get this from interviews with Dr. Hemphill previously, I do not think he can subtract or take that part of the evidence, that part of the inadmissible evidence out of his opinion.

And therefore, I don't think he should be able to base his opinion which was based most likely on Danny Waller's statement, only as to what is medically inconsistent and consistent with.

THE COURT: Can you rephrase your question, ask him how this could have occurred?

[PROSECUTOR]: I can, but may I respond - -

THE COURT: Sure.

[PROSECUTOR]:  - - to the argument?

First of all, I'd, of course, say what does a medical examiner [sic]?  Do they testify to the manner and cause of death.  And they take into account all the circumstances including, if you will, pure medicine of it.

The evidence code allows an expert to rely on hearsay as long as it is the kind of thing on which people in that field ordinarily rely.

So whether or not he was relying on in part an explanation by Daniel Waller that would be inadmissible is beside the point in reference to his opinion. **[The Prosecutor clearly understood the hearsay argument made by Defense Counsel.]** Certainly, he would not, as I have cautioned him, of course, not to verbalize that statement at least in that way.

But one, he has stated in fact what a medical examiner does is talk about the manner and cause of death and give their opinion about that. And he can utilize as indicated that information that in fact is what a forensic pathologist does.

And so we believe that the question is proper and we believe that it is not unproper, but ordinarily that a pathologist in fact does this.

[DEFENSE COUNSEL]: Judge, if I may respond. He's testified as to the cause of death as being asphyxiation. He's testified as to the manner of death as being hanging. To go beyond that now gets him into testifying about what he thought somebody did to her.

THE COURT: All right.

[DEFENSE COUNSEL]: It's not proper.

THE COURT: I'll sustain the objection to the form of the question, most likely. But he can testify as to how this could have occurred.

[DEFENSE COUNSEL]: Judge, again if I could finish my record. He's saying that he can testify about hearsay from Danny Waller.

THE COURT: I didn't say it's hearsay. I didn't say that's hearsay or not. You can ask, if you do that, what happens. You can get a certain result.

**[This statement by the court is too cryptic for one to be certain what he is saying. But the statement is certainly consistent with the view that evidence relied upon by an expert in arriving at an opinion is not hearsay. Indeed, the view of this circuit has been that when an expert testifies about such a statement, it is offered not for the truth of the statement but to show how the expert arrived at the opinion, and therefore is not**

-3-

What could defense counsel do then? If she questioned Dr. Hemphill

regarding why he changed his opinion after their prior conversation, he might

well be permitted to testify to Mr. Waller's statement. And if defense counsel

were to ask what his opinion would be based solely on the medical evidence, the

prosecutors on redirect would likely be permitted to elicit that the expert opinion

was also based on Waller's statement. Oklahoma has adopted a relatively relaxed

view in permitting experts to testify about the matters properly relied on in

forming their opinions, even when those matters are "unsubstantiated hearsay and

> **considered hearsay.** *See Wilson v. Merrell Dow Pharm., Inc.*, **893 F.2d 1149, 1153 (10th Cir. 1990)].**
>
> [DEFENSE COUNSEL]: He can testify whether the medical evidence is consistent.
>
> THE COURT: I've said that he can testify to how could you accomplish this. Maybe that's other –
>
> [DEFENSE COUNSEL]: Okay. He can testify what's more or less likely.
>
> THE COURT: I've sustained it to more likely. He can testify how it could.

Tr. 561-64 (emphasis added).

Later, when Dr. Hemphill expressed his opinion regarding how death occurred, defense counsel on several occasions objected that the opinion was tainted by non-medical evidence, saying "I object to that answer. It's not based upon his expertise." Tr. 565. Defense counsel then twice moved for a mistrial based on Dr. Hemphill's testimony, the second time explaining, "He does not have any proof of malice aforethought and by his hypothesis, through this kid [Waller], he gets it. . . . He has done so without that medical evidence and based on that, I move for a mistrial." Tr. 572.

-4-

improper character evidence." *Lewis v. Oklahoma*, 970 P.2d 1158, 1166-67 (Okla. Crim. App. 1999). (Unlike Judge McConnell, I do not read *Lewis* as saying that matters properly relied on by an expert may nevertheless be too unreliable to present to the jury in explanation of the expert's opinion. Once the trial judge ruled that Dr. Hemphill could properly rely on Waller's statement, it would be remarkable for the judge to refuse to permit Dr. Hemphill to explain the basis of his opinion if challenged by the defense.) It is not surprising that Mr. Richie's trial counsel admitted at the habeas evidentiary hearing that during cross-examination she had not wanted to open the door for Dr. Hemphill to get Waller's statement before the jury. Even one question regarding the consistency of the physical evidence with the defense theory could open the door. The single question on the matter that defense counsel asked on cross-examination was certainly not all one could hope for, but anything more precise could have led to disaster.[2]

---

[2] I do not believe that the court's sustaining an objection to Dr. Hemphill's oblique reference to Waller's statement meant that Waller's statement could not be admitted even if defense counsel later challenged the basis of Dr. Hemphill's opinion. The objection that was sustained arose as follows after Dr. Hemphill said that his findings were consistent with the prosecution's theory of how death occurred:

> [PROSECUTOR]: Do you have any information that that is not the way it occurred?
> [DEFENSE COUNSEL]: Objection, Your Honor.
> THE COURT: Overruled.

For essentially the same reason, defense counsel would have to be cautious about calling a defense expert on the cause of death. Perhaps Mr. Waller's statement could be elicited during cross-examination of the expert. More likely, Dr. Hemphill could be called as a rebuttal expert to explain the basis of his disagreement with the defense expert—namely, the statement by Mr. Waller.

Accordingly, it appears to me that defense counsel, rather than being inadequate, probably did about as well as she could have in the circumstances. She could have been more aggressive in challenging Dr. Hemphill; and, for the reasons explained by Judge McConnell, she may have escaped unscathed. But

---

> [PROSECUTOR]: I do have access and have had access since prior to the autopsy to information that someone who purported to have been there.
> [DEFENSE COUNSEL]: Your Honor –
> THE COURT: I'm going to sustain the objection.

Tr. 567.

On this occasion, the prosecutor clearly expected only a "No" answer. The answer was objectionable (besides being unresponsive) in that the information was not being offered to explain how the expert arrived at his opinion. (On the contrary, the question asked whether any information was <u>inconsistent</u> with his opinion); and the expert's opinion had not yet been challenged, so there was no reason to permit the jury to hear relied-upon evidence that could have an improper prejudicial effect.

Perhaps defense counsel should not have worried about the possibility that the trial court would allow Dr. Hemphill to tell the jury about his reliance on Waller's statement if the basis of his opinion were challenged. But such worry would seem to me to have been eminently reasonable in light of Oklahoma evidentiary law and the trial court's failure to be moved by defense counsel's complaints about Dr. Hemphill's reliance on Waller's statement.

-6-

given the enormous downside risk, it was not unreasonable to play it safe.

Further proceedings in district court are therefore necessary.[3]  Mr. Richie

raises serious issues concerning the propriety of Dr. Hemphill's use of

Mr. Waller's statement and the alleged failure of the state to provide counsel with

exculpatory statements by Mr. Waller.  The district court has not ruled on these

matters because it granted relief on another ground.  These unruled-upon grounds

may prove to be meritorious in themselves, or exploration of these grounds may

reveal deficient conduct of defense counsel that constitutes ineffective assistance.

Our ruling today does not foreclose relief on these grounds.

---

[3]Judge McConnell is correct that the analysis in this concurrence was not
set forth in the state's brief, although the basis for the analysis was explored
during cross-examination in federal district court of Mr. Richie's trial counsel.
Nevertheless, we occasionally affirm a judgment on a ground not argued on
appeal.  *See Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004).  Here, we
are reversing the federal district court but we are preserving the final judgment of
the state court.  Comity with the state courts is a particularly compelling reason to
consider grounds for affirmance not argued on appeal.  I recognize that deciding a
case on grounds not argued on appeal may be unfair to the appellant (or, as here,
the habeas petitioner) because of the lack of opportunity to respond to the
argument for affirmance.  In this case, however, I see little risk of such
unfairness.  And in any event, we are merely remanding for further proceedings,
so Mr. Richie is not foreclosed from providing additional explanation on remand
why, despite his trial counsel's concessions at the habeas hearing, it was
objectively unreasonable for trial counsel not to confront Dr. Hemphill further on
cross-examination.

*Richie v. Mullin*, 04-5072
**McCONNELL**, J., dissenting.


In late August, 1991, Petitioner Lonnie Wright Richie and a teenage friend, Danny Waller, committed a brutal and terrible crime. They kidnaped Mrs. Laura Launhardt and placed her in the closet of an abandoned house with hands and feet bound and a strap around her neck secured to the clothes rod. They took her credit and debit cards and went on a spending spree. Her dead body was found several days later. The cause of death was either asphyxiation or cardiac arrest. The question at trial was whether this was first degree, malice-aforethought murder, warranting the death penalty. The prosecution's theory was that after securing Mrs. Launhardt in the closet, the defendant killed her by raising her legs, thus putting pressure on the blood vessels in her neck and bringing about the asphyxiation. Petitioner's defense in both the guilt and the penalty phase of the trial was that he and his accomplice had left Mrs. Launhardt alive, and that death had resulted sometime later, perhaps by her slipping or fainting.

There was evidence in support of both theories. The defense relied primarily on what is delicately called "entomological evidence"—namely, the size of the maggots found on her decomposing body—which indicated, according to the defense expert, that Mrs. Launhardt had not died until the evening of August 30, two days after the defendant and his accomplice left her in the closet. The prosecution relied primarily (or perhaps exclusively, as will be discussed below)

on the expert testimony of Dr. Robert Hemphill, the state medical examiner, who gave the jury his opinion that "someone killed this person by partially suspending her by the neck while she was bound and face down in the position which she was found." It turns out, however, that had Dr. Hemphill been asked, he would have testified that there was no medical evidence supporting the conclusion that Mrs. Launhardt was deliberately suspended by anyone, and that Mrs. Launhardt could have died as a result of passing out and falling into the strap, as the defendant contended. It is the failure of defense counsel to conduct a proper cross-examination, and thus elicit this information, that led the magistrate judge to recommend, and the district judge to hold, that Petitioner was denied effective assistance of counsel.

*I. Deficient Performance*

The standard for effective assistance of counsel is not demanding. The Constitution does not require optimal, or even commendable performance; it is enough if counsel provides assistance that is "reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). And we begin our analysis with a presumption that the reasonableness standard was met, that a particular representation fell "within the wide range of reasonable professional assistance." *Id*. at 689. But when counsel's performance fails to "make the adversarial testing process work in the particular case," we must find

ineffective assistance. *Id*. at 690; *see Rompilla v. Beard*, 125 S. Ct. 2456 (2005).

I cannot agree with the majority that defense counsel met that standard.

During trial preparation, defense counsel interviewed Dr. Hemphill and concluded that his testimony would be favorable to the defense. According to the magistrate judge's summary of the evidence, "From talking with Dr. Hemphill, [counsel] understood that Dr. Hemphill's opinion was that no physical evidence supported the State's theory that Ms. Launhardt had been killed by hanging her upside down by her feet." R&R 9–10. As counsel stated at the evidentiary hearing, "I know when I walked out of that office I thought of him as our witness or as a defense witness."[1] She therefore did not retain an independent expert witness to testify at trial regarding the position of the body and the manner of death.

After the trial began, but before Dr. Hemphill testified, Dr. Hemphill approached defense counsel during a recess to inform her of a change in his intended testimony, "because I didn't want to blind-side her, so-to-speak." Hemphill Depo. 25, R. Vol. III 890. Dr. Hemphill had learned of a statement by

_____

[1]Although, as the majority notes, Dr. Hemphill's recollection does not completely jibe with defense counsel's, Dr. Hemphill confirmed in his deposition that he had informed defense counsel that the "left-alive" theory of the defense was "at least as reasonable as any other explanation" and that he "couldn't really think of anything that was any more reasonable than that." Hemphill Depo. 23, R. Vol. III at 888.

-3-

Mr. Richie's accomplice, Mr. Waller, later retracted and not admitted at trial, that death was caused by deliberately hanging the victim upside down. Based on this dubious information (and not on any change of mind regarding the medical evidence) Dr. Hemphill informed defense counsel he would now testify that the probable cause of death was deliberate strangulation. Defense counsel described herself as "devastated" by this information. Rather than request a continuance, however, which would have enabled her to prepare for cross-examination, challenge the basis of Dr. Hemphill's testimony on account of its reliance on the inadmissible statement by Petitioner's co-defendant, or call an independent defense expert, defense counsel proceeded with trial.

On direct examination, Dr. Hemphill testified as follows:

> [T]he fact that this lady was tied, her hands tied behind her back, her feet tied together, a ligature tied behind her neck and then tied to something above her and that she was partially suspended by it to me is overwhelming evidence that somebody did this to her. . . . So I believe this is a homicide. That is, I believe somebody else did this to her, she didn't do it to herself. . . . All I can say is this evidence indicates that someone killed this person by partially suspending her by the neck while she was bound and face down in the position which she was found. . . [I]t appears that—that as I said, someone partially suspended her, pulled her head up in this position while she was face down and accomplished the asphyxiation in that matter [sic].

R. Vol. VII 2083–84. According to the district court, this was "[t]he only

-4-

evidence supporting the State's theory" of malice-aforethought murder. Order 6.[2]

Since the entire defense case as to guilt and mitigation depended on the viability of the left-alive theory, it was singularly important for defense counsel to ask Dr. Hemphill if that theory, too, was consistent with the medical evidence. And indeed, if such a question had been asked, Dr. Hemphill's response would have been highly favorable to the defense. Notwithstanding his trial testimony, Dr. Hemphill believed there was no "good, measurable, hard, objective evidence" to indicate how Mrs. Launhardt died. Hemphill Depo. 16–17, R. Vol. III 881–82; *see also id.* at 33, R. Vol. III 898. He testified in his deposition that his opinion at trial, rather than being based strictly on the medical evidence, was influenced by the (now-discredited) statement by Mr. Waller that Mr. Richie had deliberately killed her by lifting her legs. As the magistrate judge summarized Dr. Hemphill's deposition testimony at the evidentiary hearing: "Dr. Hemphill, in his deposition taken on June 27, 2003, maintained that there was no scientific evidence to support a conclusion that the compression occurred by someone holding the victim's legs to cause death. . . . Dr. Hemphill informed [defense counsel] and continues to maintain in his most recent deposition, that no medical evidence existed to support the State's theory of death. According to Dr. Hemphill, absent the evidence of the

---

[2]The majority challenges that conclusion, an issue I will address below at 8–9.

co-defendant, there was no evidence that the victim was deliberately suspended by anyone." R&R 13–14.

Yet on cross-examination, defense counsel asked Dr. Hemphill only four questions:

> Q      First of all, Doctor, you have no medical evidence to show that the death occurred anywhere but Pawnee County; is that correct?
> A      That's correct.
> Q      Secondly, the larvae or maggots that you've testified about from your report, they vary in length from 2 millimeters to 1 centimeter?
> A      Let me just double check my notes.  Yes, that is correct.
> Q      And you did not collect any of these; is that right?  Preserve any of them?
> A      That's correct.
> Q      And finally, Doctor, you have no medical evidence that is inconsistent with Ms. Launhardt being tied, restrained in that closet in a sitting or standing position, correct?
> A      That's correct.

R. Vol. VII 2103–04.

Defense counsel did not ask whether the evidence was consistent with the possibility that the victim had been left alive, and the jury therefore did not receive the information that Dr. Hemphill viewed the scientific evidence as supporting the defendant's theory as well as the prosecution's.  As the district court noted, "Even Dr. Hemphill expressed surprise during his deposition testimony that [defense counsel] had not asked him about the reasonableness of the defense theory during cross-examination.  He indicated a willingness to testify, if he had been asked, that the findings at the scene of the crime were consistent with the defense's theory."

-6-

Order 6–7.

The district judge had no difficulty in concluding that this performance was constitutionally deficient, calling counsel's cross-examination of Dr. Hemphill "woefully inadequate." Order 8. "The inadequacy of the cross-examination," the court found, "is evident . . . from the trial record itself." *Id.* The court elaborated:

> There was no measurable scientific evidence to support either the State's theory or the defense theory. Dr. Hemphill was willing to testify that the defense's theory provided a reasonable explanation for the circumstances under which the victim was found. [Defense counsel], however, failed to present this significant fact to the jury through the testimony of Dr. Hemphill. The State's presentation of its "hanging" theory through Dr. Hemphill's testimony was allowed to go unchallenged.

Order 7–8 (internal citations and footnote omitted). This was consistent with the magistrate judge's evaluation:

> The trial proceeded, and [defense counsel] asked virtually no questions of Dr. Hemphill on cross-examination. [Defense counsel] completely failed to ask if the Petitioner's theory of the case was consistent with the medical evidence. Although the sole premise of Petitioner's argument was that when he left Ms. Launhardt she was alive, [defense counsel] presented no medical evidence that this theory was consistent with the medical evidence.

R&R 24. The district court thus held that defense counsel provided ineffective assistance in violation of the Sixth Amendment.

The majority reverses that decision. In doing so, the majority maintains: (1) that Dr. Hemphill's testimony was not the only support for the State's theory of deliberate strangulation (Op. 13–14); (2) that Dr. Hemphill's testimony was less absolute, and hence less damaging, to the defense than the district court allowed

-7-

(Op. 14); (3) that defense counsel's failure to question Dr. Hemphill more extensively was a strategic choice to which the court must defer (Op. 15); and (4) that far from being constitutionally deficient, defense counsel's cross-examination was "aggressive and successful" (Op. 15). I must respectfully disagree on all points.

The majority begins by holding that the district court "clearly erred in finding that Dr. Hemphill provided the only evidence supporting the state's theory." Op. 14. The majority points to the testimony of a police officer regarding the position of the victims's dress and to pictures of the crime scene, showing that when the body was found, part of the victim's skirt had fallen upward, obscuring the ligatures that bound her hands behind her back. The majority hypothesizes that this evidence regarding the position of the victim's dress "also provided evidence supporting the state's theory." Op. 14.

It is not obvious why this point, even if valid, is relevant to whether defense counsel's cross-examination of Dr. Hemphill was inadequate. If there was other evidence supporting the verdict, that might go to the question of prejudice; but it would hardly refute the district court's conclusion regarding the quality of defense counsel's performance.

But putting that aside, this line of argument regarding the position of the victim's clothing is an appellate concoction, never argued to the jury. In the

pictures discussed by the witnesses, Mrs. Launhardt's skirt had been moved to display the ligatures on the victim's wrists. Neither witness was asked about the significance of the position of her clothing, and neither commented on it independently. The prosecutor did not argue in closing that the position of the dress was significant. The prosecution's apparent lack of interest in this evidence is most clearly reflected in its passivity when the judge excluded pictures showing the dress in its upward position. Had evidence of the position of the dress been significant to the government's theory, the prosecutor would have argued as much when the trial judge determined which pictures to admit and which to exclude as duplicative. Since the argument on which the majority now relies was not presented to the jury, the majority is wrong to hold that the district court committed "clear error"—or any error at all—in finding Dr. Hemphill's testimony to be the only evidence supporting the government's theory.

Second, the majority downplays the significance of Dr. Hemphill's testimony, stating that "Dr. Hemphill's witness-stand assertions were hardly absolute, leaving both sides room to maneuver." Op. 14. The majority goes so far as to state that:

> Dr. Hemphill's sole testimony relating to the manner of death occurred in the following exchange.
>     Q:    (By Mr. Gillert [the prosecutor]) Let me ask you this hypothetical: If someone were to bind her hands behind her and bind her feet as she was found, tie the ligature around her neck and tie it to the poll with the length of the rope, would it

-9-

be consistent with your findings that they suspended the person by some lower extremity while they hung to affect the death in the manner in which you found, is that consistent?

A:     Yes.  As far as I can see, it would be consistent.

Op. 10.

Once again, it is not clear why this goes to the quality of defense counsel's performance rather than to the question of prejudice.  But more importantly, I do not think the majority's characterization of Dr. Hemphill's testimony is accurate.  His answer to Mr. Giller's hypothetical was most certainly not his "sole testimony relating to the manner of death."  Well before Mr. Giller posed his hypothetical, Dr. Hemphill testified flatly that "this evidence indicates that someone killed this person by partially suspending her by the neck while she was bound and face down in the position which she was found."  R. Vol. VII 2084.  This was in direct contradiction to the defense theory that death occurred some 48 hours after she was left in the closet in an upright position, when she slipped or fainted.  He then reiterated: "[I]t appears that—that as I said, someone partially suspended her, pulled her head up in this position while she was face down and accomplished the asphyxiation in that matter [sic]."  *Id.*  If that was not enough, Dr. Hemphill told the jury: "[T]he fact that this lady was tied, her hands tied behind her back, her feet tied together, a ligature tied behind her neck and then tied to something above her and that she was partially suspended by it to me is overwhelming evidence that somebody did this to her. . . . So I believe this is a homicide.  That is, I believe

-10-

somebody else did this to her, she didn't do it to herself." R. Vol. VII 2083. By the time the jurors heard Dr. Hemphill's assent to the prosecutor's hypothetical, they had heard him testify over and over again that someone had killed the victim. Far from "leaving both sides room to maneuver," Dr. Hemphill's testimony, if unchallenged, left little room for the defendant's left-alive theory.

The majority next argues that defense counsel's "line of questioning pursued during cross-examination objectively represents a responsive, tactical choice." Op. 16. Courts must review the strategic choices of counsel with considerable deference because there are many ways to render effective assistance in a particular case. Not only do we defer to strategic decisions, but we begin with the presumption such a strategy existed, that individual choices were guided by an overarching, sound trial strategy:

> [W]e always start the analysis that an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct *might* have been part of a sound trial strategy. . . . [W]here it is shown that a particular decision was, *in fact*, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes "virtually unchallengeable."

*Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 690 (1984)). In determining how much we are to defer to trial counsel's decisions, however, a court must first determine whether those decisions *were* strategic.

Neither the magistrate judge nor the district judge detected an ounce of

strategy in defense counsel's "woefully inadequate" cross-examination of Dr. Hemphill, and I am similarly at a loss to see it. The majority, however, holds that "[n]othing in the record would lead" to the conclusion that trial counsel's cross-examination of Dr. Hemphill was not shaped by her presumptively sound trial strategy. Op. 15. But there *is* something in the record that would lead to this conclusion: counsel's explanation of her own behavior. Counsel (who was engaged in her first capital murder trial) testified that Dr. Hemphill's change in testimony "thr[ew] a grenade in the middle of our first and second stage defense." R. Vol. III 615. Aghast at what she regarded as the destruction of the defense theory both as to guilt and mitigation, defense counsel testified that she did not cross-examine Dr. Hemphill as she ought to have done: "I was completely at a loss, given what he had just said out in the hall, and I did not handle it, did not touch it on cross-examination as I should have." R. Vol. III 614–15. Counsel acknowledged that she should have asked for a continuance to re-interview Dr. Hemphill and secure other expert testimony as to the cause and manner of death, and to "just have a chance to step back and think and strategize about how much the case had changed right there in that few moments." R. Vol. III 615. Had there been but world enough and time, counsel would have taken advantage of the break to make strategic choices; without a continuance, counsel floundered through a fleeting and inscrutable cross-examination.

-12-

To say that "nothing in the record" supports the district court's finding that defense counsel's failure to conduct a more penetrating cross-examination was not strategic, Op. 15, thus requires us to ignore counsel's testimony at the evidentiary hearing. The majority hints that this disregard of the evidence may be rooted in its view that the "testimony produced in evidentiary hearings . . . benefits in its acuity from the passage of time." Op. 13. But this is precisely the sort of evidence on which we are supposed to rely in cases of this sort. We permit criminal defendants to raise ineffective assistance of counsel claims for the first time in collateral proceedings precisely because of the utility of evidence as to counsel's trial tactics:

> A factual record must be developed in and addressed by the district court in the first instance for effective review. Even if evidence is not necessary, at the very least counsel accused of deficient performance can explain their reasoning and actions, and the district court can render its opinion on the merits of the claim.

*United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc) (footnote omitted). It seems hardly right, having insisted on the importance of developing the record to include counsels' explanations for their performance, then to ignore the very explanations for which we have asked. It may be that the majority dislikes the position in which evidentiary hearings place trial counsel, forcing them to impugn their own performance if they wish to advance their former client's position. I share that concern. But so long as *Strickland* and our

-13-

precedent require consideration of whether a decision was strategic or not, we must use whatever evidence of strategy may be at hand.

The magistrate judge who witnessed trial counsel's testimony at the evidentiary hearing was no doubt as aware as we can be of the incentives such hearings create, but the magistrate judge nevertheless credited trial counsel's testimony as to her devastation. R&R 21–24. Indeed, the state objected to the magistrate judge's report and recommendation on the ground that the magistrate had relied too heavily on trial counsel's evidentiary hearing testimony. Order 8. The district court rejected this argument, approving the magistrate's use of the testimony to "confirm[] that [trial counsel's] failure to elicit critical testimony from Dr. Hemphill was clearly not a strategic decision." *Id*. This was a credibility determination, which commands "even greater deference to the trial court's findings" than do other findings of fact. *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985). I can agree that where counsel's post hoc testimony contradicts the record or is otherwise implausible in light of the record, the factfinder should take it with a grain of salt. But in this case, counsel's testimony is consistent with and corroborated by Dr. Hemphill's testimony regarding his change of testimony and her reaction to it, and is confirmed by the utter lack of any incisive cross-examination. An appellate court's suspicion that a witness had an incentive to shade her testimony regarding her past thoughts and emotions is insufficient to

-14-

justify overruling a lower court's credibility determination. In light of the especially deferential clearly erroneous standard of review due such determinations, I cannot accept the majority's finding that counsel's cross-examination performance was the product of a strategic decision.

In response to this argument, the majority observes that the district court found "counsel's performance was deficient . . . on the face of the trial record," Op. 15 n.5, and thus maintains that there was no credibility determination to which we must defer. But the majority conflates the district court's determination that defense counsel's cross-examination of Dr. Hemphill was deficient (which was based on the trial record) with its determination that the cross-examination was not guided by any particular strategy, which was a credibility determination based on defense counsel's testimony at the evidentiary hearing. *See* Order 8 ("[t]he inadequacy of the cross-examination is evident . . . from the trial record itself. [Defense counsel's] evidentiary hearing testimony simply confirmed that her failure to elicit critical testimony from Dr. Hemphill was clearly not a strategic decision."). The majority disregards the second of these determinations, and holds defense counsel's course of action to be strategic, claiming there is no record evidence to the contrary. Op. 14. That improperly disregards the district court's fact-finding.

The majority suggests that counsel's cross-examination was a reasonable

tactical choice because "a longer cross-examination of Dr. Hemphill may have resulted in more resolute testimony, and a redirect examination reinforcing the state's theory of the case." Op. 17. But we know what Dr. Hemphill would have said if asked whether the medical evidence supported the left-alive theory, because he said so in his deposition. Such a question would not have elicited "more resolute" testimony reinforcing the prosecution's position, but an affirmation that the defendant's "left-alive" theory was consistent with the evidence. R&R 24. As Dr. Hemphill testified:

> All [defense counsel] would have to do to counter any of [my testimony] would be to say, but is there any scientific evidence that indicates that indeed what Mr. Waller said happened did happen in this case? And the answer is, well, no.

Hemphill Depo. 30, R. Vol. III 895. But if there were any doubt about what Dr. Hemphill would say if he were seriously cross-examined, as the magistrate judge pointed out, defense counsel could have sought—but did not—a continuance to interview the witness and find out. R&R 11.

Rather than there being "[n]othing in the record" to undermine the presumption that counsel's decisions were strategic, in actuality nothing in the record points the other way. The cross-examination was exactly what trial counsel testified it was: a debacle guided by no strategy at all. If there was no strategy, there is no reason to extend the special deference we accord strategic decisions, and no reason to convert an objectively unreasonable performance into an

-16-

acceptable one.

Finally, the majority maintains that defense counsel's performance was objectively reasonable. Indeed, the majority comments: "Although defense counsel understandably may have felt 'devastated' by her conversation with Dr. Hemphill, her conduct during his testimony was aggressive and successful." Op. 15. The majority elaborates:

> We disagree with the district court's conclusion that counsel's cross-examination was deficient on the face of the record. Experience teaches that rarely can performance be measured by the length of cross-examination alone. In this case, counsel engaged in a succinct line of questioning going to the heart of her case. Questions were posited regarding the size of the maggots on Mrs. Launhardt's body to support the anticipated testimony of Dr. Greenburg. Moreover, defense counsel established through the testimony of Dr. Hemphill that the victim could have been tied or restrained in a sitting or standing position. While it is true that defense counsel did not explicitly ask whether the evidence was consistent with the victim being left alive, we cannot say that this single omission, if it was that, under all the circumstances present renders counsel's performance constitutionally deficient.

Op. 16–17 (internal footnotes omitted). With these few rather cursory sentences, the majority overturns the thorough and careful opinions to the contrary by the magistrate and district court judges below. I cannot agree with the majority's assessment.

It is true that defense counsel did *something* on cross-examination, succeeding in eliciting support for the defense estimate of the time of death, based on the entomological evidence. But doing something is not always enough: "The

-17-

duty of counsel is not merely to do 'something' rather than nothing on behalf of one's client, but to act as the client's effective advocate during each critical stage of the defense." *Fisher v. Gibson*, 282 F.3d 1283, 1307 (10th Cir. 2002). When a matter is central to the theories of both the prosecution and defense, counsel's obligation to meet the prosecution's evidence is heightened. *See Rompilla v. Beard*, 125 S. Ct. 2456, 2462, 2467 (2005). With a few questions, defense counsel could have ensured that the defense theory was left alive at the end of Dr. Hemphill's testimony. Failing to ask those few questions was not a "single omission," Op. 16, but a glaring failure to counter evidence "at the very heart of the prosecution's case." *Id.* at 2470 (O'Connor J., concurring) (emphasis omitted).

It is necessary to compare counsel's performance not to an ideal, Perry Mason-style defense, and not to a standard of "doing nothing," but to what a reasonably competent counsel could accomplish under the circumstances of the case. His deposition for the evidentiary hearing reveals that, if asked, Dr. Hemphill would have testified that the medical evidence was consistent with the defense theory:

> Q: . . . So is it fair to say, Doctor, that Mrs. Launhardt could have passed out from medications and fallen into this strap and that could be the mechanism that caused this?
> A: With emphasis on the word "could have," yes.
> Q: All right. Is it fair to say that Miss Launhardt could have experienced an arrhythmia from relatively mild constriction of the neck and that's what could have caused or contributed to this death?
> A: Could have, yes.

-18-

Q: All right.  Is it fair to say that Miss Launhardt could have passed out from an arrhythmia or even died from it directly and that's what could have caused this death?
A: Yes.
Q: Is it fair to say that Miss Launhardt could have been left alive and tied up in that closet for a period of time?
A: Yes.
Q: And is it fair to say that without the co-defendant's statement there was no evidence she was deliberately suspended by anyone?  I think that's what you've told us already, Doctor.
A: Well, I want to be sure that I'm—since this is such a sticky part with everybody I want to be sure I get it right this time.  That without the co-defendant's statement–
Q: There was no evidence she was deliberately hanged by anyone.
A: Okay.  You're only referring to the suspension.  Not anything else in this scenario.  No evidence that someone else intentionally suspended her.
Q: That's what I'm asking you.
A: As far as I know there is no other evidence that directly indicates that.

R. Vol. III 937–38.  The contrast between what could have been accomplished on cross-examination and what was accomplished is stark.[3]

Although defense counsel's attempt to set the stage for the entomological expert was commendable, the task at hand was to counter Dr. Hemphill's

---

[3]Defense counsel exacerbated the poor cross-examination by summarizing it inaccurately in closing arguments.  Counsel argued to the jury that Dr. Hemphill testified that the victim could have been "left there restrained, but alive . . . there's nothing [in the medical evidence] inconsistent with that."  R. Vol. VIII 2229.  But this is precisely what Dr. Hemphill did not testify to on cross-examination, because he was never asked to testify on this point.  An attentive juror would be likely to discount an argument that inaccurately summarized the testimony on which it was based.

-19-

testimony that "someone killed this person by partially suspending her by the neck while she was found and face down in the position which she was found." Defense counsel did nothing of the sort, despite Dr. Hemphill's willingness to acknowledge that the scientific evidence was entirely consistent with the defendant's theory of the case. Questions about maggots must have seemed to the jury a digression. Counsel's fourth question—whether the victim could have been tied or restrained in the closet in a sitting or standing position—could have served as the opening salvo in an effective line of questioning, but without more, it must have seemed to the jury more a confirmation of guilt than a step in a line of defense.

## II. The Theory of the Concurrence

Putting forward an argument not made in the briefs or clearly argued below, the concurrence suggests a possible strategy behind the cross-examination. According to the concurrence, defense counsel "had little room to maneuver," given the danger that any question about the bases of Dr. Hemphill's opinion or the recent change in it would have led to the admission of Mr. Waller's otherwise inadmissible hearsay statements, which would have been highly damaging to the defense. It was better, the concurrence seems to suggest, to lay low. Con. 1. This assessment of defense counsel's position, however, seriously overestimates the danger of opening the door to Mr. Waller's statement, and glosses over substantial

barriers to its admission.

The concurrence takes an unduly narrow view of the options available to trial counsel, presupposing that any questions about the medical support for the left-alive theory would have prompted Dr. Hemphill to relate Mr. Waller's statement. According to the concurrence, "[e]ven one question regarding the consistency of the physical evidence with the defense theory could open the door." Con. 2. The concurrence assumes that trial counsel could not avoid asking Dr. Hemphill why he changed his opinion before trial. It is far from self-evident, however, that merely establishing that the medical evidence was consistent with the left-alive theory—without mentioning Dr. Hemphill's about-face—would have opened the door to Mr. Waller's statement. Similarly, the concurrence supposes that if defense counsel had called a defense expert on the cause of death, Dr. Hemphill could have introduced Mr. Waller's statement on rebuttal to explain his disagreement. *Id.* But it is not at all clear why calling another expert to establish the left-alive theory would have opened the door to Mr. Waller's statement on rebuttal. Rebuttal evidence is evidence which attempts to "disprove or contradict" the evidence to which it is contrasted. Black's Law Dictionary 579 (7th ed. 1999). "[W]hether or not rebuttal evidence is admissible depends on 'whether the initial proof might affect the case and whether the rebuttal evidence fairly meets the initial proof.'" *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005) (quoting

-21-

Christopher B. Mueller & Laird C. Kirkpatrick, 1 Federal Evidence § 12 n.2 (2d

ed. 2004)); *see also United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001)

("[W]hen otherwise inadmissible, rebuttal evidence must be reasonably tailored to

the evidence it seeks to refute. . . . [T]here must be a nexus between the purported

rebuttal evidence and the evidence that the purported rebuttal evidence seeks to

rebut."). Expert testimony exploring the medical evidence is not refuted by a

layman's purported eyewitness account.

Even if Dr. Hemphill attempted to introduce Mr. Waller's statement, it

seems quite unlikely that Oklahoma law would have permitted it to come in.[4]

---

[4]The concurring opinion states that defense counsel "vigorously and repeatedly object[ed] that such use of hearsay was improper. The trial judge, however, overruled the objections." Con. 1. I do not read the transcript that way. When the issue first arose, defense counsel objected that Dr. Hemphill should not be permitted to testify which mode of death was "most likely," because that judgment would be based on Mr. Waller's hearsay statement rather than the medical evidence. R. Vol. VII 2079–80. That objection was sustained, but the court allowed Dr. Hemphill to testify as to "how this [the death] could have occurred." *Id.* at 2080, 2082. During this exchange, the judge stated: "I didn't say [Waller's statement is] hearsay. I didn't say that's hearsay or not." *Id.* at 2082. Defense counsel then made a series of objections to statements and questions regarding how the death could have occurred, all of which were overruled. *Id.* at 2083–84. When Dr. Hemphill started to allude to information he had access to from "someone who purported to have been there"—a reference to Mr. Waller—defense counsel again objected, and the objection was sustained, and the jury was admonished to disregard the answer in which Dr. Hemphill alluded to Mr. Waller's statement. *Id.* at 2085. The trial court thus found at least some uses of the Waller statement improper, though whether the basis for the rulings was hearsay or something else is not clear.

First, there is serious doubt whether Mr. Waller's statement was reliable. According to the concurrence, Oklahoma has "adopted a relatively relaxed view" of permitting experts to testify about the bases of their opinions, even when they have relied on "unsubstantiated hearsay and improper character evidence." Con. 2 (quoting *Lewis v. Oklahoma*, 970 P.2d 1158, 1166 (Okla. Crim. App. 1999)). But *Lewis* does not support the inference that Oklahoma courts will freely admit otherwise inadmissible evidence as long as it is filtered through an expert. The defendant in *Lewis* objected to the admission of "unsubstantiated hearsay and improper character evidence" by an expert witness as part of the basis of his opinion. The Oklahoma Court of Criminal Appeals agreed that some of the evidence should not have been admitted because it might not have come from "a reliable source." *Lewis*, 970 P.2d at 1166–67. Because the expert had properly relied on "substantial admissible evidence," the court found the error in admitting the unreliable evidence to be harmless on a highly deferential plain error standard of review. *Id*. at 1167. The *Lewis* court made clear that the opportunity to admit evidence underlying an expert's opinion is not "a license to parade a mass of inadmissible evidence before the jury." *Id*. (quoting *Sellers v. State*, 809 P.2d 676, 685 (Okla. Crim. App. 1991)). However relaxed Oklahoma's standard for admitting hearsay and character evidence as the basis of an expert's opinion, *Lewis* does not stand for the proposition that an expert may shepherd patently unreliable

-23-

testimony into the record.

Second, if experts rely on otherwise inadmissible evidence, it must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." 12 Okla. Stat. Ann. § 2703. It is unlikely that Dr. Hemphill's reliance on Mr. Waller's retracted statement meets that standard.[5] I find it very difficult to believe that medical experts asked to testify about the physical evidence routinely discount scientifically plausible theories on the basis of inadmissible statements by participants in the crime. Furthermore, there was a mechanism available to probe the appropriateness of Dr. Hemphill's reliance on Mr. Waller's statement: *Lewis* holds that, "upon request of either party, [the trial court must] hold an *in camera* hearing to determine whether an expert's reliance on particular information is reasonable." *Lewis*, 970 P.2d at 1167. Trial counsel thus had an opportunity to determine—outside the presence of the jury—not only whether Mr. Waller's statement could be admitted, but whether Dr. Hemphill's reliance on it was reasonable. Not to take advantage of this mechanism falls short of effective assistance.

Finally, the fact that Dr. Hemphill relied on the Waller statement does not

---

[5]Since the State did not advance on appeal the argument made in the concurrence, we have not had the benefit of the parties' briefing on whether Dr. Hemphill's reliance on Mr. Waller's statement was proper under the Oklahoma law of evidence.

obviate the basic prerequisites to admissibility. Even if evidence is sufficiently reliable and of an appropriate type to justify an expert's reliance, it may be inadmissible if it is unduly prejudicial. The *Lewis* court admitted the evidence on which the expert properly relied only after determining that "it was probative and its probative value was not outweighed by the danger of unfair prejudice." *Id*. Defense counsel would have had a strong argument that the danger of prejudice substantially outweighed whatever probative value there was in Mr. Waller's statement.

Thus, I cannot agree with the concurrence that a carefully crafted cross-examination of Dr. Hemphill would inevitably, or even probably, have opened the door to introduction of Mr. Waller's damaging statement. That defense counsel feared Dr. Hemphill would introduce the Waller statement does not make it so. *See* Con. 2. Counsel's unwarranted fear only confirms the real reason for her failure to present the defense theory: she panicked. To abandon one's position for fear of a chimera hardly meets the standard of effective representation. The game was far from up, but trial counsel abandoned the crucial element of the defense. The concurring opinion, like the majority, supplies no adequate reason to dispute the district court's conclusion that this cross-examination was "woefully inadequate."

*III. Prejudice*

Deficient performance is only one aspect of ineffective assistance; in order to violate the Sixth Amendment right to counsel, the weaknesses in counsel's performance must also prejudice the defendant. In order to demonstrate prejudice a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The likelihood that prejudice resulted from counsel's deficient performance alters with the strength of the government's case: "a verdict . . . only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id*. at 696.

The jury's presumed finding that Petitioner did not leave his victim alive, but actively caused her death, was only weakly supported by the evidence. The government relied primarily, if not exclusively, on Dr. Hemphill's testimony to establish that Petitioner actively killed the victim. Defense counsel's failure to subject that evidence to meaningful adversarial testing allowed the government's equivocal evidence to be presented to the jury as unequivocal. Moreover, the facts of the case suggested a plausible alternative: that the defendants left their victim alive and upright in the closet, and that she died as the result of slipping or fainting up to 48 hours later. It would surely have been helpful to the defense to

-26-

establish that the medical evidence regarding the position of the body was consistent with both scenarios.

The fact that at the time of the trial the jury could have accepted the left-alive theory and still have convicted on felony murder makes it even more likely that the jury might have acquitted on the malice aforethought murder charge had defense counsel properly tested the government's evidence supporting this charge.[6]  Defendant has therefore satisfied both prongs of the *Strickland* test.

*IV. Conclusion*

A few weeks ago, in *Rompilla v. Beard*, 125 S. Ct. 2456 (2005), the Supreme Court reversed the lower court's denial of habeas relief on account of ineffective assistance of counsel in a case in every way weaker than this one.  In *Rompilla*, the state court reviewed the conviction on the merits, and the decision was therefore entitled to deference under the Antiterrorism and Effective Death

---

[6]The government argues that the jury could have found Petitioner guilty of malice aforethought murder even if it had accepted Defendant's left-alive theory. This argument is unpersuasive.  The government's assertion that one can be guilty of malice aforethought murder when leaving a victim alive but in unpropitious circumstances is supported by a lone, unpublished case from the Tennessee Court of Criminal Appeals, a fact which does not inspire confidence that this is in fact the state of the law in Oklahoma.  Moreover, the mere possibility that a jury, although not urged to do so by the prosecutor, might nevertheless have convicted on malice aforethought murder while believing the victim was left alive, does not mean that Defendant was not prejudiced.  A defendant need only show a "reasonable probability that . . . the result of the proceeding would have been different" to demonstrate prejudice.  *Strickland*, 466 U.S. at 694.

Penalty Act, 28 U.S.C. § 2254(d). *See id.* at 2462 (noting that the Court could grant habeas relief only if the state court's decision was "[not only] incorrect or erroneous [but] objectively unreasonable") (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)). In this case, the state court improperly found that Mr. Richie's ineffective assistance claim was procedurally barred, and as the majority holds, our review is therefore de novo. Op. 5 n.1. Moreover, in *Rompilla*, defense counsel supplied facially reasonable justifications for their failure to undertake a more thorough search for mitigating evidence. *See id.* at 2462 ("the merits of a number of counsel's choices in this case are subject to fair debate"). In this case, defense counsel acknowledged that her inadequate cross-examination was a product of her surprise and "devastation" at learning of Dr. Hemphill's intended change of testimony. Far from being "subject to fair debate," the district court found defense counsel's performance in this case "woefully inadequate." Finally, the prejudice in *Rompilla*—the possibility that the jury might have been moved by evidence of the defendant's egregious upbringing to mitigate its appraisal of his culpability—was far more speculative than the prejudice from the inadequate cross-examination in this case, which concealed from the jury the fact that the prosecution's expert witness believed the medical evidence equally supported the defendant's theory that the victim was left alive. If the jury had known that the prosecution's medical evidence was equivocal, that knowledge,

-28-

coupled with the entomological evidence suggesting that death occurred some 48 hours after Mr. Richie and Mr. Waller left Mrs. Launhardt in the closet, might well have resulted in acquittal of malice aforethought murder.

In short, this is the unusual case where the performance of defense counsel was not only objectively deficient, but likely contributed to a wrongful conviction for a capital crime.  I respectfully dissent.